THE PATRIOTIC. THE BOWLING GREEN.
TICE TOWING LINE v. O'BOYLE
et al.

(Circuit Court of Appeals, Third Circuit.
September 9, 1926.)

No. 3411.

1. Towage ⬡11(7)—Tug held in fault for injury to barge in tow by striking pier of drawbridge.

The wooden center pier of a drawbridge *held*, on the evidence, in good condition before a

14 F.(2d)—57

tow passed through, and injury to the second of two barges in the tow, by striking the pier, *held* due to fault of the tug in permitting the first barge to swing against and break the planking of the pier, causing a timber to project, which pierced the second barge.

2. Towage ⬡11(7)—Tug held negligent in passing through a drawbridge on an ebb tide at excessive speed.

A tug, with two barges in tow tandem, *held* negligent in passing through the 60-foot draw of a bridge on an ebb tide, with a strong side wind blowing and at excessive speed, and in fault for injury to one of the barges by striking the center pier of the bridge.

3. Admiralty ⬡118—Findings of trial judge, who saw and heard the witnesses, entitled to great weight.

Great weight should be given to the findings of a trial judge, who saw and heard the witnesses, and they should not be disturbed, unless clearly against the evidence.

Appeal from the District Court of the United States for the District of New Jersey; Lynch, Judge.

Suit in admiralty by the Tice Towing Line, claimant of steam tug Patriotic, against Anthony O'Boyle, owner of barge Bowling Green, and the counties of Hudson and Essex, N. J. Decree dismissing libel, and libelant appeals. Affirmed.

Park & Mattison, of New York City (Henry E. Mattison, of New York City, of counsel), for appellant.

Macklin, Brown & Van Wyck, of New York City (Gerald J. McKernan, of New York City, of counsel), for appellee O'Boyle.

Robert H. Doherty, of Jersey City, N. J., for other appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal by the Tice Towing Company from a decree of the District Court, dismissing its libel and finding that the barge Bowling Green was damaged in an accident which was caused by the "careless and negligent seamanship or navigation upon the part of those in charge of the Patriotic" in taking a tow through the draw of the plank road bridge over the Hackensack river in New Jersey on November 20, 1918. She was towing the barge Cape Mercy, stern first, on a short hawser, and immediately behind her, in tandem style, the Bowling Green, a barge of 1,000 tons' capacity. The barges were so close together that there was scarcely any space between them. The tide was running ebb, setting over against the center abutment, and a strong west wind of about 20 miles an hour

was blowing in the same direction, toward the abutment. The tow was going at about 8 miles an hour, under "a single bell and a jingle." As the Bowling Green was going through the draw, her port bow struck the abutment with such force that a 12x12 timber, sticking out at that point, went clear through her hull.

[1] There is for determination a question of fact as to when this timber became loosened from the abutment and projected, so that it pierced the Bowling Green. The appellant contends that the bridge was out of repair; that the evidential timber had been loosened in some way at some prior time, and allowed to remain projecting, and in consequence it struck the port bow of the Bowling Green, and that the counties of Hudson and Essex, which own and operate the draw, are liable for the damage done to the barge, because they negligently maintained the bridge in that condition.

Several witnesses, who saw the bridge frequently and knew its condition, testified that before the Patriotic went through the draw that day the abutment was in good repair. William P. Dugan, superintendent of the Lincoln Highway bridges, whose duty it was to inspect this bridge, testified that prior to the day of the accident he did not "see any timbers sticking from the center piece, the center abutment, out about the knuckle of the bridge." Thomas F. Cunningham, engineer at the bridge, said "its condition was good," but, after the Patriotic went through, "three or four planks all loosened out." Frank E. Norton, the "bridge attendant," testified that before "the tow came through the draw that day" the condition of the center abutment "was all right. It was in good condition as far as I could see. I was looking at it every day." But "after the tow went through" it was "pretty well smashed up, after they hit it." "It looked to me as if the 12x12 was smashed and the planks on it also."

What probably happened was that the first barge, Cape Mercy, hit the center abutment at the knuckle, broke some of the planks, and loosened the 12x12 timber, so that it stuck out and pierced the hull of the Bowling Green as she came along. This is indicated by the testimony. Mr. Cunningham testified on this subject as follows:

"Q. Did you notice whether or not the first boat, in passing through the draw, struck either side of the draw? A. Well, I think it was the first one that did strike.

"Q. Well, what side did this boat hit? A. It hit on the west side of the smoothing iron.

"Q. Was that on the same side— A.

Same side as where the Bowling Green was supposed to have hit." * * *

"Q. Well, now, what part of the barge struck what part of the bridge? A. Why, the first one, I imagine, whatever name it was, I don't recall the name, that was the one that hit first; that is when I heard the planks begin to creek; of course, it sprung.

"Q. And then what did you hear next? A. That's all; the tow went right through.

"Q. In other words, you heard the first barge strike the center abutment—is that right? A. Yes, sir.

"Q. You didn't see it strike—you heard it strike? A. I saw it; I was looking at it."

Frank E. Norton, the "bridge attendant," gave similar testimony:

"Q. Did you see either of those boats that were in tow of the Patriotic strike any part of the drawbridge? A. Yes.

"Q. What barge hit what part of the bridge? A. The first barge hit about here near the knuckle—about there; the center pier, we call it.

"Q. How close to the knuckle would that be? A. I should say about four feet this side of where it turns.

"Q. What part of the first barge hit that point? A. About the center.

"Q. And what happened after that, if anything? A. Then she swung over towards the quarter pier, along on the other side of the channel, and then it swung back again. Then it hit that part that supports the sidewalk, and threw our sidewalk about four inches out of line.

"Q. Which barge? A. The second barge done that. * * *

"Q. Did you take note of the condition of the center abutment about the knuckle before the tow came through the draw that day? A. Yes; I seen it.

"Q. State what its condition was. A. It was all right. It was in good condition, as far as I could see. I was looking at it every day.

"Q. Did you notice its condition after the tow went through? A. Yes.

"Q. What was its condition? A. Pretty well smashed up after they hit it.

"Q. Just state what that smashed condition consisted of. A. It looked to me as if the 12x12 was smashed, and the planks on it also.

"Q. How many planks were smashed over the side, if any, after the tow passed through the draw? A. Two or three of them."

We are satisfied, and find, that the center abutment was in good condition before the tow passed through; that the Cape Mercy

collided with it loosening several planks, and caused the 12x12 timber to project so that it pierced the port bow of the Bowling Green. [2] The next and only question is whether or not those in charge of the Patriotic were negligent while going through the draw, or in attempting to go through, under the conditions then existing. If they were, was the collision due, either wholly or in part, to their negligence?

If they were negligent, their negligence consisted in going through the draw at a time when a careful and prudent captain would not have done so, or in going through the draw in a negligent manner, or in both. Capt. Joseph R. Ford, who had been navigating the Hackensack river and taking tows through that draw for 25 years, said that it was bad seamanship to attempt to pass through that draw, of 60 feet width, at an ebb tide, the wind blowing 20 miles an hour, with a tow of two barges of 1,000 tons each. Capt. Edsall Smith, master of the Patriotic, himself said it would have been safer not to go through on ebb tide. All agreed that the safe time to go through was when the wind was not blowing so hard.

The only or principal argument advanced to the contrary was that "you would not be able to pay your bills at the end of the month" if tows were not taken through under conditions existing at that time. Capt. Ford further said that it was decidedly not good seamanship, under the conditions, to tow those barges through that draw under a speed of "one bell and a jingle," "full speed," or half speed and something more. Capt. West, appellant's expert, nowhere denied this. Consequently the speed with which the Patriotic went through the draw under the circumstances stands uncontradicted as an example of bad seamanship.

[3] The learned trial judge found that "the proximate cause of the accident was careless and negligent seamanship or navigation upon the part of those in charge of the Patriotic." Great weight should be given to the findings of a trial judge, who saw and heard the witnesses testify. They should not be disturbed, unless the error is manifest and clearly against the evidence. The Dolbadarn Castle, 222 F. 838, 138 C. C. A. 264; The W. H. Flannery, 249 F. 349, 161 C. C. A. 357; The Beaver, 253 F. 312, 165 C. C. A. 94; The Mahanoy, 258 F. 114, 169 C. C. A. 200; National Dredging & Lighterage Co. v. Turney Transportation Co. (C. C. A.) 281 F. 315; American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co. (C. C. A.) 282 F. 514; Low Transportation Co. v. Davis, Director General of Railroads (C. C. A.) 9 F. (2d) 392.

We see no reasons why they should be disturbed here, and so the decree is affirmed.